## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD M. WILSON, | CASE NO. 3:13-cv-00709-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 8, 11, 16, 19 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Edward Wilson for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts that, *inter alia*, the administrative law judge ("ALJ") erred in assessing his claims and an examining physician's opinion that he could not sit for more than three hours in an eight-hour work day. Although the ALJ cited to various pieces of information to discredit Plaintiff's credibility, she failed to acknowledge substantial contradictory objective evidence that supports Plaintiff's claims. She also made multiple factual

errors in characterizing the record. These omissions and errors preclude meaningful review. The ALJ also erred in discounting the opinion of the examining physician solely on the grounds that Plaintiff could drive, "be active" with his nineteen year old daughter, and expressed interest in owning a business, as none of these activities contradict the physician's opinion. For the foregoing reasons, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter remanded to the Commissioner for further proceedings.

## II.    Procedural Background

On October 20, 2009, Edward M. Wilson ("Plaintiff") filed an application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Tr. 165-174). On March 18, 2010, Plaintiff's DIB application was denied on the grounds that a prior application for DIB operated as res judicata to preclude DIB benefits.[1] On March 18, 2010, the SSA application was also denied,

---

[1] The Court notes that the ALJ's opinion likely constitutes an "implicit reopening" fr the prior DIB decision, even though she asserted that her analysis was limited to the SSI analysis. "[A] reopening will be found when there is an administrative review of the entire record and a decision is reached on the merits of the claim." *Tobak v. Apfel*, 195 F.3d 183, 186 (3d Cir. 1999) For SSI, a claimant's onset date is irrelevant, and the ALJ is required to develop the record for only one year prior to the SSI application. 20 C.F.R. §§ 416.335, 416.912(d). Thus, the ALJ was only required to develop the record after October 20, 2008. However, the ALJ extensively relied on medical records from 2006 and 2007, which would be relevant to a DIB claim given Plaintiff's amended onset date of January 2006 (Tr. 88), to conclude that Plaintiff was not credible and not entitled to benefits. Overall, the opinion appears to review the entire record and

and Plaintiff filed a request for hearing on March 24, 2010. (Tr. 125-136, 137). On March 9, 2011, a hearing was held before an ALJ at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified (Tr. 71-110, 125-29). On April 25, 2011, the ALJ found that Plaintiff was not disabled and thus was not entitled to benefits. (Tr. 29-46). On June 17, 2011, Plaintiff filed an appeal with the Appeals Council (Tr. 26-28), which denied Plaintiff's request for review on September 11, 2012, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 11-15).

On March 18, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1. On April 15, 2013, Commissioner filed an answer and administrative transcript of proceedings. Docs. 7, 8. In August, October, and December 2013, the parties filed briefs in support. Docs. 11, 16, 19. On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. On June 2, 2014, Plaintiff notified the Court that the matter is ready for review. Doc. 21. On July 29, 2014, the undersigned entered a report and recommendation to deny Plaintiff's appeal. Doc. 22. Plaintiff filed an objection, and the Court recommitted the matter to the undersigned for further

---

places heavy emphasis on medical evidence that is only directly relevant to the DIB claim. Because the Court recommends remand for other reasons, the ALJ may exercise discretion to revisit this factor.

proceedings on December 10, 2014. Doc. 25, 27.

## III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on August 13, 1962 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 41). He has a tenth grade education and past relevant work as an iron/steelworker, truck driver, and garbage collector. (Tr. 40, 205).

Plaintiff injured his back, neck, and shoulder in a work accident in 2001. (Tr. 79).  Plaintiff's earning report and work history report indicate that he stopped working after his accident in May of 2001.[2] (Tr. 182, 186). The earliest medical record available to the Court is from January of 2006 by Plaintiff's pain specialist, Dr. Amy Fitzsimmons, M.D. (Tr. 272). However, Dr. Fitzsimmons indicated that she had been giving Plaintiff Botox[3] injections for a "couple of years" prior to

---

[2] There was a $1,000 payment in 2002, which Plaintiff thought was a bonus. (Tr. 159, 182).
[3] Botox can be used as a "neuromuscular blocking agent" to treat upper limp spasticity and reduce neck pain.

2006 along with epidural and facet block injections and physical therapy, without relief.  (Tr. 269-70). At the hearing before the ALJ, Plaintiff's counsel represented that earlier records had been destroyed in accordance with the provider's document destruction practices. (Tr. 80).

Plaintiff continued treatment with Dr. Fitzsimmons, receiving four Botox injections and a nerve block injection, through mid-2007. The Botox injections were the "only thing that [gave] him some significant relief," but it "wears off" after a period. (Tr. 265, 269). As a result, Plaintiff continued to experience significant pain in his neck and cervical spine with demonstrated objective findings, including "tremendous" muscle spasm on January 31, 2006; "marked" muscle spasm on March 14, 2006; muscle spasm on May 2, 2006; June 13, 2006; August 10, 2006; and September 14, 2006; "extreme" muscle spasm and tenderness on January 2, 2007; muscle spasm on February 13, 2007; and "very limited range of motion" on March 27, 2007. (Tr. 263, 267-69, 271-72). Dr. Fitzsimmons observed that Plaintiff maintained posture "with his shoulder elevated" so she ordered physical therapy to correct his posture and address his "persistent spasms." (Tr. 263).

Dr. Fitzsimmons also treated Plaintiff with an escalating dose of Endocet, a narcotic. On March 14, 2006, Plaintiff indicated that "[h]e did have a problem with

http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/103000s5251lbl.pdf (Last accessed December 17, 2014).

his nephew taking some of his drugs….His nephew has now joined the Army, partly because of what has happened, and he feels like he is back on track." (Tr. 271). Plaintiff remained on a stable dose of Endocet through March 21, 2007, when he reported that he "hurt his back on the ice several days ago when he was trying to chop the ice up. His right leg is now going numb." (Tr. 262).[4] Dr. Fitzsimmons increased his Endocet to 210 tablets per month. (Tr. 261).

In mid-April 2007, Plaintiff reported severe right knee pain after he "seemed to twist it" while "working with his daughter for some lacrosse moves." (Tr. 261, 297). MRIs indicated joint space narrowing, marginal osteophyte formation, patellofemoral compartment arthropathy, possible suprapatellar joint effusion, and chondromalacia patella with effusion. (Tr. 302-03). He was referred to Dr. John Beight, M.D., who treated him with an aspiration and injection on April 20, 2007. (Tr. 297).  Dr. Beight noted that they "briefly discussed patellofemoral implant and arthroscopic debridement of patella, should non-operative treatment fail." (Tr. 297). At a follow-up on June 15, 2007, Plaintiff reported no benefit from the aspiration/injection. (Tr. 295). He reported that he was "trying to spend more time sitting at work." (Tr. 295). Dr. Beight noted that he "discussed treatment options with patient… discussed implant surgery. Quite effective in pain relief but I feel he

---

[4] Plaintiff's counsel suggested that Plaintiff was dealing with an "ice storm." (Tr. 90). The Court notes that the National Weather Service reported a major winter storm in the area on March 16, 2007. http://www.erh.noaa.gov/phi/view_wss.php (last visited December 13, 2014).

is a suboptimal candidate because of his size, youth and strains/stresses he will put across knee during his iron work." (Tr. 295).

On July 5, 2007, Dr. Fitzsimmons was forced to discontinue Plaintiff's Botox injections because she could "not order from this company again, as [she had] been having problems with them financially. Plaintiff tells me he cannot afford to pay for it out-of-pocket and wait for the reimbursement." (Tr. 260). She increased his Endocet to 250 tablets per month. (Tr. 260).

On July 13, 2007, Plaintiff followed-up with Dr. Beight and indicated he wanted to proceed with an arthroscopic debridement in his knee. (Tr. 295). Dr. Beight noted that knee replacement surgery was "absolutely contra-indicated until other options have failed." (Tr. 295). Dr. Beight performed the arthroscopic debridement on July 30, 2007, and at some point began prescribing Endocet for Plaintiff. (Tr. 295, 304-05).

After Plaintiff's surgery, the pharmacy alerted Plaintiff's providers that Dr. Beight, Dr. Fitzsimmons, and Dr. Palazzolo, Plaintiff's primary care physician, were all writing prescriptions for Endocet for him. (Tr. 258, 296). Dr. Fitzsimmons discussed this with Plaintiff, who stated that "he was unaware that he was not supposed to get prescriptions from three different doctors," which Dr. Fitzsimmons thought was "unusual." (Tr. 258). She did a urine toxicology screen, voided his

Endocet prescriptions, converted him to 20 mg of Oxycontin three times per day and refused to give him any breakthrough medications. (Tr. 258).

On October 4, 2007, Plaintiff followed-up with Dr. Fitzsimmons. (Tr. 256). He reported that he took an extra Oxycontin one day, and that it provided "much better pain control." (Tr. 256). Dr. Fitzsimmons responded that "at no time in the future is he to use the medication outside of the way that it is directed." (Tr. 256). She increased his Oxycontin to 40 mg three times per day. (Tr. 256). On October 26, 2007, Plaintiff followed-up with Dr. Fitzsimmons. (Tr. 255). She indicated that he had called several days earlier to request breakthrough medication because he was "much more active than he was…taking walks; he is doing things." (Tr. 255). She declined to provide breakthrough medication because of his recent compliance problems, but did increase his dosage to 80 mg of Oxycontin every twelve hours. (Tr. 255). She noted that "I would like him to be active, but I do not think he is going to be able to do things like a multi-mile AIDS walks. That is not going to be the goal of our therapy here. He is going to try to get his pain under better control." (Tr. 255). She ordered another MRI of the cervical spine, noting his spine "is a major part of his pain, and perhaps he needs a surgical evaluation." (Tr. 255).[5]

---

[5] The ALJ did not request cervical spine MRIs from any provider, and none are contained within the record. On March 14, 2006, Dr. Fitzsimmons noted that a past MRI indicated he "does not show any kind of frank compression of a nerve," but this is several years before the relevant period. (Tr. 271).

On November 13, 2007, Plaintiff established care with Heidi Wright, CRNP. (Tr. 229). His examination was "limited by his morbid obesity." (Tr. 229). She prescribed him an appetite suppressant. (Tr. 229). On December 20, 2007, Plaintiff followed-up with her for a new patient physical. (Tr. 229). Plaintiff was "on disability related to the work injury." (Tr. 228). He reported that obesity had been a problem since his mobility decreased after his work accident. (Tr. 228). His weight was unchanged after a month being prescribed an appetite suppressant. (Tr. 228). His examination was again "limited by obesity" but he did have degenerative changes of the knee and limited range of motion of the cervical spine. (Tr. 228).

Plaintiff continued following-up with Dr. Fitzsimmons. On December 21, 2007, she observed that he was "still using an awful lot of pain medication and still reporting a 8 to 8.5/10 pain" and added Skelaxin to his medication regimen. (Tr. 254). On December 26, 2007, she noted that Plaintiff had been taking an "escalating dose of narcotics" while his pain was still "not under control." (Tr. 253). She gave him an EMG, which indicated "[c]hronic bilateral C6 radiculopathies. Chronic bilateral carpal tunnel syndrome. Early signs of a sensory peripheral neuropathy." (Tr. 234). She noted that "we are going to try to get him okayed for the Botox." (Tr. 253). On January 23, 2008, she observed that Plaintiff was "really not doing very well since [she] saw him last." (Tr. 252). He reported that his prescriptions had been stolen on an airplane. (Tr. 252). He also reported

that he "found his wife cheating on him" and she had "involved their 16-year old daughter." (Tr. 252). He was "really stressed out, tearful" and reported a "lot of stomachaches he thinks may be related to the Skelaxin samples [she] gave him, although the Skelaxin does help him sleep. He does identify the last weeks as the worst two weeks he has ever had." (Tr. 252). She noted that "we have not gotten him fully approved for the Botox yet." (Tr. 252).

On January 28, 2008 Plaintiff followed up with Ms. Wright, who wrote that he "seems to be someone that prefers surgery as the first choice in any situation. I have told him that it may not always be the best option….He is no longer doing the work that probably was the precipitating factor in the cause." (Tr. 228).

On March 14, 2008, Plaintiff followed-up with Dr. Fitzsimmons.  (Tr. 251). Plaintiff reported that he took a third Oxycontin "at least eight times" since his visit in January. (Tr. 251). She noted that "[h]e says to me that he did not know what to do. He is in a lot of pain. He has been under a lot of stress socially with his wife and daughter and his pain level. He still is not being approved to the Botox, which significantly helped in the past. This is the final warning, and I made it very clear to Ed that any change in his use of medications other than what is directed will result in me discharging him…He said he is going to get counseling for the stress." (Tr. 251). She renewed his pain medication. (Tr. 251). By May 9, 2008, he had lost weight and "did not take medication, but felt like he wanted to take an

extra pill." (Tr. 250). She added Oxycodone to his medications.  (Tr. 250). On July 3, 2008, Plaintiff's "left shoulder [had] really been hurting him." (Tr. 249). He had spasms, tenderness, and a positive impingement sign. (Tr. 249). Dr. Fitzsimmons restricted him from abducting his shoulder, gave him samples of Flector patches and continued his Oxycontin and Oxycodone. (Tr. 249).

On August 13, 2008, Plaintiff saw Dr. Leonard Brody, M.D. with bilateral hand complaints. (Tr. 237). He had a positive Tinel sign and Phalen sign. (Tr. 237). Plaintiff indicated that he had been wearing splints "to no avail," so they scheduled carpal tunnel releases for both hands. (Tr. 237). After the releases, Plaintiff's "pre-operative numbness [was] virtually resolved" but he had "significant grip strength weakness," so Dr. Brody scheduled him for occupational therapy. (Tr. 233-36).

In follow-ups with Dr. Fitzsimmons through the end of 2008, Plaintiff continued to experience pain, but was compliant with his medications, as indicated by a urinalysis in August of 2008. (Tr. 232). He made various statements to her about his activities and plans. For instance, he reported that he "had been thinking about buying a trucking business, but the truck was old, and he decided not to do it." (Tr. 237). However, Dr. Fitzsimmons later indicated that "was planning on opening a small business. He had some money set aside from the settlement and it sounds like he is having some domestic problems and that money is all gone." (Tr.232). Plaintiff would later testify that his wife had taken all of his money from

a joint checking account. (Tr. 97). Dr. Fitzsimmons indicated in November of 2008 that he was "currently trying to find a job. He asked me to write him a letter that states he is cleared for all activity. I did tell him it would be better for him to find the job and ask them to send me a job description, at which point I could specifically address the areas that he would need to be doing." (Tr. 232).

By January 14, 2009, Plaintiff was "very depressed" as he was separating from his wife, and by March 13, 2009, he had moved in with his father, three hours away. (Tr. 244-45). Once he started driving three hours to see Dr. Fitzsimmons, his objective symptoms increased. On March 13, 2009, he had neck spasms, although he "continue[d] to look for work." (Tr. 244). On May 7, 2009, he had limited range of motion and reported that he had lost his medications when a water heater soaked them. (Tr. 333). He had a urinalysis that day and Dr. Fitzsimmons continued his prescriptions. (Tr. 333). On July 2, 2009, Plaintiff had muscle spasms in the mid to lower thoracic paraspinals bilaterally and reported that sitting in a car for a three-hour drive caused his back to "really hurt." (Tr. 332).  On August 20, 2009, he was having spasms in between his shoulder blades and kept his shoulders held in an elevated position. (Tr. 331). He reported that his back was "killing him and is worse with long distance driving" with pain at a  "9/10 after driving 3 hours to come see me and then his daughter," a trip he made every two months. (Tr. 331). Plaintiff began ambulating with a cane and reported pain in his back, bilateral

knees, and "all of his joints" in October and December of 2009. (Tr. 329-30). On December 10, 2009, Plaintiff reported that he was "currently on welfare" and would "like to go on SSI." (Tr. 329). He also had a urinalysis that indicated he was compliant with his medications. (Tr. 328-29).

On February 4, 2010, Plaintiff reported to Dr. Fitzsimmons that the pain was worse in his knee, that "both his knee caps were bothering him," and if he "sits too long his back and knees hurt him." (Tr. 328). His neck was getting "really stiff" and he was "getting a lot of spasms in his neck." (Tr. 328). He was ambulating with a cane and had a positive apprehension test, but was able to sit and arise with relative ease. (Tr. 328). She assessed him to have patellafemoral syndrome along with chronic pain. (Tr. 328). Dr. Fitzsimmons continued his narcotics medications and prescribed him six weeks of physical therapy. (Tr. 328).

On February 22, 2010, Plaintiff had a consultative examination with Dr. Raymond Kraynak, D.O. (Tr. 281). Plaintiff indicated that he had to "sit, stand, lay and change positions as needed" and that he had tried "physical therapy and injections without improvements." (Tr. 281). He was ambulating with a cane. (Tr. 281). He "looked older than his stated age" and "appear[ed] to be in a fair amount of discomfort." (Tr. 282). He was "morbidly obese." (Tr. 283). Objective findings on exam indicated that he was "unable to walk on his heels or on his toes…[h]e had a lot of muscle spasm in his cervical/lumbar spine. Straight leg raising was

positive in a sitting and supine position. He has had crepitus through ROM and had some swelling. Poor peripheral pulses were noted in the femoral popliteal and anterior tibial areas." (Tr. 283). He also had limited range of motion in his shoulder, elbow, wrist, knee, hip, cervical spine, and lumbar spine. (Tr. 287). Dr. Kraynack opined that Plaintiff could lift and carry up to ten pounds occasionally, stand or walk for one to two hours in an eight-hour day, and sit for two to three hours in an eight-hour day. (Tr. 284).

On March 16, 2010, Dr. Gerald Grycrko, M.D., reviewed Plaintiff's file. (Tr. 288). He opined that Plaintiff could sit for up to six hours out of an eight-hour work day. (Tr. 289). He reviewed Dr. Kraynak's opinion, and indicated that Dr. Kraynak's conclusions were not "significantly different" from his findings. (Tr. 292). He wrote that Plaintiff "has described daily activities that are significantly limited. This is consistent with the limitations indicated by other evidence in this case." (Tr. 293). He wrote that:

> The medical evidence shows that despite ongoing treatment, he continues to have pain which significantly impacts on his ability to perform work-related activities. He has pursued appropriate follow-up care for his impairments. He has aggressively pursued treatment for his impairments. Additionally, he received treatment from a specialist for his impairments. He did undergo surgery for his wrist impairments, which has not resulted in a significant improvement in his symptoms. While he has undergone physical therapy in the past, he is not currently attending physical therapy. He requires an assistive device to ambulate. Also, he uses a Tens unit. He has been prescribed, and has taken, appropriate medications for the alleged impairments…His pain is so severe that his physician has prescribed narcotic pain medication.

(Tr. 293).

On April 2, 2010, Plaintiff reported to Dr. Fitzsimmons that the pain in his knees was "killing him" and that he was "severely depressed." (Tr. 327). He was "now using a cane to walk around." (Tr. 327). He continued to hold his head very stiffly. (Tr. 327). On May 3, 2010, a variety of tests, including a rheumatoid factor test, were negative. (Tr. 317).

On May 13, 2010, Plaintiff had a lumbar epidural steroid injection with Dr. Llewelyn Williams, M.D. (Tr. 313). On May 18, 2010, Plaintiff followed-up with Dr. Williams. (Tr. 307). Dr. Williams wrote that Plaintiff "works in the iron works…[h]e is not working but he is involved in litigation." (Tr. 307). Plaintiff reported that his pain was "throbbing, achy, shooting, and sharp in character. It is decreased by lying down,"  that it was "increased by standing, walking, sitting, and bending." Dr. Williams noted that "[t]hese symptoms affect his quality of life, his general activity, enjoyment of life, mood, relations with others, sleep, walking ability and work a 10 out of 10" and that "[h]e has tried acupuncture and chiropractor which weren't helpful. He had some medicine, heat, and ice and used the TENs unit sometimes." (Tr. 307). Dr. Williams observed that Plaintiff "has problems walking" and "ambulates with a cane." (Tr. 307).  Dr. Williams observed muscle spasm in his lower back, sacroiliac joint tenderness, decreased range of motion in his lower extremities, sensory deficit in the right thigh, and a positive

straight leg raise bilaterally. (Tr. 308). Plaintiff had another lumbar epidural steroid injection. (Tr. 308).

Plaintiff continued following-up with Dr. Fitzsimmons. On May 27, 2010, he reported that Dr. Williams' steroid injection gave him no relief and he started getting headaches after the injection. (Tr. 326). He had a urinalysis that indicated he was compliant with his medications. (Tr. 323, 326). On July 22, 2010, Plaintiff reported that he would be going for an epidural in the lower back, even though the last one "only gave him headaches and no relief but he is willing to try it again." (Tr. 325). He was ambulating with a cane. (Tr. 325). He reported that his "low back pain may be coming from the [three hour] car ride [to Dr. Fitzsimmons office]." (Tr. 323). He reported that he took a walk and his right knee "blew up." (Tr. 323). He ambulated with a cane and had reduced range of motion, but he could sit and arise with relative ease. (Tr. 323).

On March 9, 2011, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 71). He testified that he gained weight after his work accident. (Tr. 77). He reported limited range of motion in his neck and "excruciating" pain on movement. (Tr. 81). He reported that he could not sit for more than twenty minutes at time and that he spends most of his day laying in bed or on a couch. (Tr. 94, 98-99). He repeatedly indicated that sitting at the hearing was painful and that he would like to "lie down" immediately. (Tr. 81, 93). He reported problems sleeping

as result of pain, problems with grasping objects and dropping items, needing a cane to ambulate, and being unable to lift anything heavier than his cane. (Tr. 86, 87, 94). He explained that he does not do "much" around the house, and that his nineteen year old daughter lives with him and helps. (Tr. 88, 91-92). He indicated that she does the shopping, and that when she takes him with her, he has to ride in a motorized cart. *Id.* He testified that he no longer drives "much" and that a friend drove him to the hearing. (Tr. 78). When asked if he exercises, Plaintiff testified that he tries to "move a little bit" to walk around the house and go to the bathroom, but indicated that he could not walk more than a half a block. (Tr. 91, 93).

Plaintiff addressed his medical records, testifying that he was not working in June of 2007, that he went to his daughter's lacrosse games but did not play lacrosse with her, and that if he had purchased his small business, he would have hired someone else to do the work. (Tr. 83, 89, 97). With regard to his knee surgery, Plaintiff testified that "[o]ne doctor said that [he] might need surgery on both knees." (Tr. 81). He explained "they cleaned the one out of something…and they said I might need a knee replacement." (Tr. 81).  He explained the knee replacement was never scheduled because "[he] was too young." (Tr. 97).

On April 25, 2011, the ALJ issued a decision. (Tr. 42). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 30, 2009, the application date. (Tr. 34). At step two, the ALJ found that Plaintiff's

cervical radiculopathy, morbid obesity, patellofemoral syndrome, degenerative joint disease of the knees, and bilateral carpal tunnel syndrome were severe impairments. (Tr. 35). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 35). The ALJ determined that Plaintiff had the RFC to perform sedentary work (sitting for six hours out of an eight-hour work and walking for two hours out of an eight-hour work day) but cannot push or pull with the lower extremities, use ladders, or work in temperature extremes of cold, wetness, vibrations, or hazards, and is limited to occasional pushing and pulling with the upper extremity, grasping, bending, balancing, stooping, crouching, crawling, kneeling, and climbing. (Tr. 36). At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 40). At step five, the ALJ found that Plaintiff could perform other work in the national economy in positions as a surveillance system monitor, bench assembler, and visual inspector. (Tr. 41). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 41).

## VI.     Plaintiff Allegations of Error

### A.     The adequacy of the hypothetical to the VE

Plaintiff challenges the hypothetical presented to the VE by the ALJ. As the Third Circuit has explained:

> [O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a

claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety (like Rutherford's here) are really best understood as challenges to the RFC assessment itself.

*Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005). Here, the ALJ proffered all of the limitations in the RFC to the VE. Thus, this is essentially a challenge to the RFC, not the adequacy of the VE hypothetical.

First, the Court notes that the ALJ did not accurately characterize the VE's testimony. The ALJ included a limitation to occasional grasping, and the VE testified that Plaintiff would not be able to perform the positions of a bench assembler or visual inspector if limited to occasional grasping. (Tr. 41). Thus, the ALJ's conclusion that Plaintiff could work as a bench assembler or visual inspector lacks substantial evidence. However, the VE testified that, with all of the limitations assessed by the ALJ, Plaintiff could still work as a surveillance system monitor. (Tr. 106).

Second, the Court notes that both Dr. Kraynak and Dr. Grycrko opined that Plaintiff could never crouch, crawl, or climb scaffolds. The ALJ gave Dr. Gryckro's opinion great weight, but he did not include a limitation to never crouching or crawling. (Tr. 36). The ALJ gave no reason for rejecting these

limitations or for finding Plaintiff less limited than all of the medical experts. Thus, his conclusion that Plaintiff could occasionally crouch or crawl lacks substantial evidence. However, this was likely harmless, because the Dictionary of Occupational Titles ("DOT") states that crouching and crawling is not required for a surveillance system monitor:

> Crouching: Not Present - Activity or condition does not exist
> Crawling: Not Present - Activity or condition does not exist
> Reaching: Not Present - Activity or condition does not exist
> Handling: Not Present - Activity or condition does not exist
> Fingering: Not Present - Activity or condition does not exist
> Feeling: Not Present - Activity or condition does not exist

379.367-010  SURVEILLANCE-SYSTEM  MONITOR,  DICOT  379.367-010. Similarly, any error by the ALJ in finding that Plaintiff did not need additional handling and fingering limitations was harmless, because handing and fingering is not required for a surveillance system monitor. *Id; Rochek v. Colvin*, 2:12–CV–01307, 2013 WL 4648340 at *12 (W.D.Pa. Aug.23, 2013); *see also  Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005). However, as will be discussed below, the ALJ erred in rejecting Plaintiff's claims and Dr. Kraynak's opinion that he could not sit for more than three hours. This error was not harmless, because a surveillance system monitor must be able to sit for six hours in an eight hour day.

**B.**   **The ALJ's credibility assessment**

**a.**   **Legal Framework**

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. Under this evaluation, a variety of factors are considered, such as: (1) "objective medical evidence," (2) "daily activities," (3) "location, duration, frequency and intensity," (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain. *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)). "As finder of fact, the ALJ is given considerable discretion in making credibility findings." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing *Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983)). However, the ALJ must still give "serious consideration" to a claimant's testimony, and must afford it "great weight" if corroborated by medical evidence:

> [T]he Third Circuit standard…requires (1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence, *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir.1981); *Bittel v. Richardson,* 441 F.2d 1193, 1195 (3d Cir.1971); (2) that subjective pain "may support a claim for disability benefits," *Bittel,* 441 F.2d at 1195, and "may be disabling," *Smith,* 637 F.2d at 972; (3) that when such complaints are supported by medical evidence, they should be given great weight, *Taybron v. Harris,* 667 F.2d 412, 415 n. 6 (3d Cir.1981); and finally (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence. *Green v. Schweiker,* 749 F.2d 1066, 1070 (3d Cir.1984); *Smith,* 637 F.2d at 972.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). An absence of medical evidence does not constitute contrary medical evidence. *Green v. Schweiker*, 749 F.2d 1066, 1070-71 (3d Cir. 1984). ("[D]ismissal of subjective symptomology on the basis of an *absence* of direct medical evidence is at odds with the Third Circuit standard, the new statute, and the Secretary's own regulations.").

Here, Plaintiff's complaints were supported by objective medical evidence showing muscle spasm, limited range of motion, difficulty ambulating, and positive straight leg raises. Plaintiff's complaints were also supported by Dr. Kraynak's opinion. As discussed in more detail below, the ALJ makes factual mischaracterizations and omits significant facts in concluding that Plaintiff was not credible. The Court recommends remand for the ALJ to properly evaluate Plaintiff's credibility.

### b. Plaintiff's alleged misuse of medications

The ALJ places great emphasis on Plaintiff's supposed misuse of prescription medications, but she makes substantial factual errors in characterizing the record. The ALJ also did not develop the record regarding Plaintiff's substance use at the hearing. She merely noted that "there was some notes in the records from the doctors with regard to the medication and they were concerned about the amount of medication you had been taking and getting refills," but did not follow-up with any questioning regarding his improper use of medications.[6] (Tr. 85).

The ALJ relies on Plaintiff's May 7, 2009 visit with Dr. Fitzsimmons, and concluded that it indicates that "the claimant's physician suspected that he might be selling his narcotic medications" because he reported pain but "admitted he was not taking any Oxycontin." (Tr. 39). However, there is no indication in the record that Dr. Fitzsimmons "suspected" Plaintiff of selling his Oxycontin. (Tr. 231). The ALJ also wrote that May 7, 2009 "appears to be the last time the claimant saw Dr. Fitzsimmons….she ordered the claimant to present for urine toxicology screening, but there is no record that this was done." (Tr. 39). However, Dr. Fitzsimmons specifically stated on May 7, 2009 that "[u]rine toxicology screening *was done* today." (Tr. 231) (emphasis added). Moreover, Dr. Fitzsimmons saw Plaintiff on July 2, 2009; August 20, 2009; October 15, 2009; December 10, 2009; February 4, 2010; April 4, 2010; May 27, 2010; July 22, 2010; and September 16, 2010. (Tr.

---

[6] She only asked how many Oxycodone and Oxycontin he was presently prescribed. (Tr. 85).

333). These visits would have supported the Plaintiff and undermined the ALJ's conclusion.

On July 2, 2009, Plaintiff followed-up with Dr. Fitzsimmons because sitting in a car for a three-hour drive caused his back to "really hurt" and on August 20, 2009, Plaintiff reported his pain was "9/10 after driving 3 hours to come see me and then his daughter." (Tr. 331-32). On February 4, 2010, he reported that if he "sits too long his back and knees hurt him." (Tr. 328). On September 16, 2010, he reported that his "low back pain may be coming from the [three hour] car ride [to Dr. Fitzsimmons office]." (Tr. 323). All of these support Dr. Kraynak's opinion that Plaintiff can only sit for up to three hours. These notes also indicated objective findings, like muscle spasm, ambulating with a cane, and a positive apprehension test, that undermine the ALJ's conclusion that his complaints were not supported by objective findings. (Tr. 328-332).

These records also indicate that Plaintiff was compliant with his prescription medication throughout the relevant period. On December 10, 2009, Dr. Fitzsimmons noted that "urine toxicology screening was done today." (Tr. 329). On February 4, 2010, she wrote that his urine toxicology was "consistent with [his] prescriptions." (Tr. 328).  On May 27, 2010, Plaintiff had another urine toxicology, which was again "consistent with [his] prescriptions." (Tr. 323, 326). The presence

of Plaintiff's narcotics in Plaintiff's urine undermine the ALJ's conclusion that he was selling them.[7]

Generally, if the Court "cannot tell if significant probative evidence was not credited" as opposed to "simply ignored," the Court will remand. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000). In this case, it appears significant probative evidence *was* ignored, as the ALJ believed that Plaintiff never saw Dr. Fitzsimmons after May 7, 2009. These records corroborated Plaintiff's claim and Dr. Kraynak's opinion that he could only sit for three hours, and undermined the ALJ's conclusion that he could sit for six hours. They thoroughly discredited the ALJ's conclusion that Plaintiff was abusing these medications, as he regularly took and passed urine screens. They provided objective support for Plaintiff's complaints and undermined the ALJ's conclusion that objective findings did not support his symptoms.

The ALJ cited to other records from the years prior to the relevant period where she inferred that Plaintiff was abusing prescription medications. However, she did not properly characterize these records. The ALJ indicated that Plaintiff was selling his drugs because Plaintiff "admitted 'his nephew [was] taking some of his drugs' illegally." (Tr. 39). However, the full quote for this reference is from Plaintiff's March 14, 2006 follow-up with Dr. Fitzsimmons, which states "He did

---

[7] The ALJ also never mentions that Plaintiff's urinalysis in August of 2008 indicated that he had been taking the correct dose of narcotics as prescribed. (Tr. 232).

have a problem with his nephew taking some of his drugs….His nephew has now joined the Army, partly because of what has happened, and he feels like he is back on track." (Tr. 271). In other words, Plaintiff did not give his drugs to his nephew voluntarily, and the nephew joined the Army as a result of him taking the drugs. The ALJ cited to records from January 23, 2008 and March 2008 as evidence that he was "misusing potent narcotic prescribed medications." (Tr. 38). The ALJ also wrote that this record showed that Plaintiff had "requested additional pain medications 'at least eight times.'" (Tr. 38). However, what the March record actually says is that Plaintiff *took* an extra dose of medication eight times. (Tr. 251).

Even if the ALJ had properly characterized these records, she still fails to acknowledge that Plaintiff was in compliance with his medication regime throughout the entire relevant period, and the year prior to the relevant period. To the extent the ALJ may rely on Plaintiff's alleged misuse prior to the relevant period, she must acknowledge his compliance during the relevant period and explain how the prior misuse relates to his credibility during the relevant period. Overall, the record indicates that Plaintiff had compliance issues with his prescription medication once Dr. Fitzsimmons discontinued his Botox injections, which was approximately the same time he injured his knee, had knee surgery, found out his wife was allegedly cheating on him, and his wife and daughter

moved out. After conversations with Dr. Fitzsimmons regarding compliance, Plaintiff indicated that he would go to counseling to deal with his stress. By May of 2008, he was reporting that he did not take additional pills, even when he wanted to. Thereafter, he took and passed urinalyses every six months indicating that he was taking the correct dose of medication as prescribed and had no subsequent compliance issues. The ALJ's mischaracterization regarding Dr. Fitzsimmons' treatment and Plaintiff's urinalyses precludes meaningful review. Thus, the ALJ did not properly rely on Plaintiff's supposed substance abuse.

### c.    Plaintiff's allegedly conservative treatment

The ALJ also relies on Plaintiff's allegedly conservative treatment, but again makes factual errors in characterizing the record. For instance, the ALJ wrote that "[t]here is no evidence to indicate that the claimant has sought any addition [sic] care or treatment of knee pain" after his arthroscopy on July 30, 2007. (Tr. 38). However, Plaintiff continued to receive narcotic pain medication from Dr. Fitzsimmons for pain in his knees through September of 2010. (Tr. 323-332). As discussed above, the ALJ ignored most of this evidence after erroneously concluding Plaintiff's last visit with Dr. Fitzsimmons was on May 7, 2009. On October 15, 2009, Plaintiff reported pain at 9/10 in his bilateral knees. (Tr. 330). On December 10, 2009, Plaintiff reported that "[a]ll of his joints were aching him." (Tr. 329).  On February 4, 2010, Plaintiff reported to Dr. Fitzsimmons that the pain

was worse in his knee and that "both his knee caps were bothering him." (Tr. 328). She assessed him to have patellafemoral syndrome. (Tr. 328). On April 2, 2010, Plaintiff reported to Dr. Fitzsimmons that the pain in his knees was "killing him." (Tr. 327). On September 16, 2010, he reported that he took a walk and his right knee "blew up." (Tr. 323). Plaintiff was treated with narcotics and physical therapy for his pain, including the pain in his knees, during this time. (Tr. 323-332).

The ALJ concluded that Plaintiff's treatment was conservative because of the number of "pages" in the record and because there was a "scarcity" of treatment. (Tr. 37). The ALJ cited to a note by Heidi Wright, CRNP, who is not an acceptable medical source, who opined that Plaintiff "appears to be the type of person to prefer to resort to surgical intervention before pursuing conservative treatment options." (Tr. 39). Although Ms. Wright's notation does appear in the record, the ALJ does not mention evidence that contradicts this inference. For instance, the ALJ never mentions Dr. Grycrko's opinion that Plaintiff:

> [H]as pursued appropriate follow-up care for his impairments. He has aggressively pursued treatment for his impairments. Additionally, he received treatment from a specialist for his impairments. He did undergo surgery for his wrist impairments, which has not resulted in a significant improvement in his symptoms. While he has undergone physical therapy in the past, he is not currently attending physical therapy. He requires an assistive device to ambulate. Also, he uses a Tens unit. He has been prescribed, and has taken, appropriate medications for the alleged impairments…His pain is so severe that his physician has prescribed narcotic pain medication.

(Tr. 293). The ALJ also never mentions that Plaintiff has attempted acupuncture and visits to a chiropractor. (Tr. 307).

The ALJ emphasized the number of pages in the administrative record, but Plaintiff's counsel represented to the ALJ that some medical records had been destroyed due to the length of time since treatment. (Tr. 80).  The ALJ rejected this contention because there was no notation indicating the document destruction practices in the medical records and because Plaintiff was not credible. (Tr. 38). However, the ALJ had no basis to assume that a doctor, tasked with evaluating a patient's medical condition, would make note of administrative document destruction practices. Moreover, even if the ALJ had properly found Plaintiff to be less than credible, it was Plaintiff's counsel, not Plaintiff, who represented to the ALJ that the documents have been destroyed. The ALJ provided no reason to find Plaintiff's counsel to be less than credible, particularly given counsel's ethical duty of candor. PA ST RPC Rule 3.3. The Court also notes that the earliest treatment notes in the record are follow-ups, which suggests that there are earlier treatment records that could not be obtained. (Tr. 272). Additionally, in March of 2006, Dr. Fitzsimmons noted that she had been giving Plaintiff Botox injections for a "couple of years" and epidural and facet block injections prior to that, without relief.   (Tr. 270). If the ALJ was unsure whether the documents had been destroyed, she could have contacted his treating providers. 20 C.F.R. §

416.920b(c)(1). Similarly, the ALJ does not mention that this particular administrative record includes multiple pages scanned onto a single page (Tr. 228-242) and that some providers' records had notes from multiple dates on a single page. It also does not appear that the ALJ or the state agency attempted to obtain any records whatsoever from Dr. Palazzolo, Plaintiff's treating physician, or from physical and occupational therapists referenced in the record.[8] Thus, the ALJ was not entitled to rely on the number of pages to determine that Plaintiff's treatment was conservative.[9]

In sum, the ALJ mischaracterized Plaintiff's treatment for his knee, selectively cited the opinion of Ms. Wright, who is not an acceptable medical source, while ignoring the opinion of Dr. Grycrko, who is an acceptable medical source, and provided no legitimate reason to reject Plaintiff's counsel's contention that earlier medical records had been destroyed. Thus, the ALJ did not properly rely on Plaintiff's allegedly conservative treatment in rejecting his credibility.

### d.  Lack of objective evidence

---

[8] 20 C.F.R. § 416.912(d)("Our responsibility. Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary … We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports….Every reasonable effort means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination.").

[9] The Court also notes that, in *Fargnoli v. Massanari*, 247 F.3d 34 (3d Cir. 2001), the Third Circuit described 115 pages of medical records as "voluminous." Id. at 42.

The ALJ wrote that there was no "real clinical, physical, neurological or diagnostic evidence" that supports his claims and that recent exams "revealed little more than muscle spasm and joint tenderness." (Tr. 38). First, muscle spasm is one of the listed examples of objective evidence of pain in the Regulations, and the record indicates that, at times, Plaintiff had a "tremendous," "marked," and "extreme" amounts of spasm. (Tr. 271-72). 20 C.F.R. § 416.929(c)(2) ("Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption."). Second, even if muscle spasm did not provide objective evidence, a lack of objective evidence may never be used, alone, to reject credibility. *Id.* ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work…solely because the available objective medical evidence does not substantiate your statements.")

Third, the ALJ never mentions much of the objective evidence in the record, including evidence of trigger points, limited range of motion, positive straight leg raises, ambulating with a cane, or other ambulatory deficits. Specifically, Dr. Fitzsimmons observed on August 10, 2006 that Plaintiff had trigger points. On July 3, 2008, Plaintiff had a positive impingement sign. (Tr. 249). (Tr. 267). Dr.

Fitzsimmons observed limited range of motion on March 21, 2007; January 14, 2009; May 7, 2009; and September 16, 2010. (Tr. 243, 245, 262, 323). Ms. Wright observed limited range of motion on November 13, 2007. (Tr. 228).  Dr. Kraynak observed limited range of motion on February 22, 2010. (Tr. 287). Dr. Williams observed limited range of motion on May 18, 2010, along with a sensory deficit in the right thigh. (Tr. 308). Dr. Kraynak and Dr. Williams observed a positive straight leg raise on February 22, 2010 and May 18, 2010, respectively. (Tr. 283, 308).   Dr. Kraynak also observed that Plaintiff was "unable to walk on his heels or on his toes…[h]e had a lot of muscle spasm in his cervical/lumbar spine... He has had crepitus through ROM and had some swelling. Poor peripheral pulses were noted…" (Tr. 283).

The ALJ wrote that Dr. Fitzsimmons "routinely noted that he was able to carry his body well and do things such as sitting and standing with relative ease. (Exhibit 10F, p. 8)." (Tr. 38). In the record referenced by the ALJ, Dr. Fitzsimmons did observe that he could sit and stand with relative ease, but noted that he was ambulating with a cane. (Tr. 330). There is no indication he could "carry his body well." (Tr. 330). More importantly, the ALJ does not acknowledge that Dr. Fitzsimmons repeatedly observed problems ambulating. On February 13, 2007, she observed that he maintained posture with his shoulder elevated, and she prescribed physical therapy because "his posture look[ed] like it [was] getting into

bad positions." (Tr. 263).  On August 20, 2009, she observed that he was keeping his shoulders held in an "elevated position." (Tr. 331).(Tr. 325, 327-30). Dr. Fitzsimmons also noted that Plaintiff sits "with his hands in a flexed position," he "hold[s] his head very stiffly," and "turns with his shoulders instead of head." (Tr. 326-27, 329). Similarly, Dr. Williams observed that Plaintiff "has problems walking" and "ambulates with a cane." (Tr. 307).

Moreover, the ALJ does not appear to acknowledge that Plaintiff's obesity, extensively documented in the record, supports his claims regarding his symptoms. Tr. 228). "Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." 20 C.F.R. Pt. 404, Subpt. P. App. 1, Pt. A § 1.00Q; *see also* SSR 02-1p (Obesity may be "of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings" and "[o]besity can cause limitation of function… An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.").

Failing to acknowledge objective evidence generally requires a remand, particularly when an ALJ emphasizes a lack of objective evidence. *Burnett v.*

*Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000) (remanding where ALJ failed to mention "contradictory, objective medical evidence," including loss of range of motion, mild limp, and tenderness).

The Court also notes that the ALJ did not rely on any individual with medical training to conclude that objective evidence failed to support Plaintiff's claims. Neither Dr. Grycrko's nor Dr. Kraynak's opinions indicated an absence of objective evidence. Instead, Dr. Grycrko noted that Plaintiff's allegations were "consistent with" the medical evidence in the case. (Tr. 293). Dr. Kraynak observed multiple objective findings to support his opinion. Thus, the ALJ's conclusion that Plaintiff's claims were not supported by objective findings was likely an impermissible lay interpretation of medical evidence. As the Third Circuit has observed:

> We also note that the ALJ acted improperly in discrediting the opinions of Dr. Scott by finding them contrary to the objective medical evidence contained in the file. By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence. Again, if the ALJ believed that Dr. Scott's reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *see also Maillet v. Colvin*, 3:12-CV-01209, 2014 WL 940174 at *13 (M.D. Pa. Mar. 11, 2014) (Kane, J.) (Remanding because ALJ's determination that objective findings failed to support limitations assessed in medical opinion constituted "erroneous lay interpretation of

the medical records" because the physicians "noted several objective findings."). Thus, the ALJ failed to properly discount Plaintiff's credibility based on a purported absence of objective symptoms.

### e.    Alleged inconsistencies regarding knee replacement surgery

Plaintiff testified that "they said I might need a knee replacement" but that it was never scheduled because "they said I was too young." (Tr. 81, 96). The ALJ found that this was inconsistent with his treatment records, which included a note that a knee replacement was "absolutely contraindicated." (Tr. 295). However, on April 20, 2007, Plaintiff saw Dr. John Beight, M.D. (Tr. 298). Dr. Beight noted that they "briefly discussed patellofemoral implant and arthroscopic debridement of patella, should non-operative treatment fail." (Tr. 297). On June 15, 2007, Dr. Beight noted that he "discussed implant surgery. Quite effective in pain relief but I feel he is a suboptimal candidate because of his size, youth and strains/stresses he will put across knee during his iron work." (Tr. 295). Dr. Beight's discussion with Plaintiff regarding a knee replacement "should non-operative treatment fail," but decision not to proceed due to his age, is entirely consistent with Plaintiff's testimony that he "might" need a knee replacement, but that they did not proceed due to his age.  The ALJ erred in relying on this purported inconsistency.

### f.    Plaintiff's alleged return to work

The ALJ wrote that Plaintiff has "worked after the onset date of disability of June 1, 2001," based on medical records from June 15, 2007; August 14, 2008; October 8, 2008; November 15, 2008; and May 18, 2010. (Tr. 38). Plaintiff's earning report and Work History report indicate that he stopped working after his accident in May of 2001. (Tr. 182, 186). On June 15, 2007, he reported that he was "trying to spend more time sitting at work" and Dr. Beight noted that he was a suboptimal candidate for a knee implant because of the "stresses he will put across knee during his iron work." (Tr. 295). Plaintiff addressed the notation from June 15, 2007, indicated that it was wrong, and that he had not been working. (Tr. 83).

On August 14, 2008, Plaintiff reported that he "had been thinking about buying a trucking business, but the truck was old, and he decided not to do it." (Tr. 237). On October 8, 2008, Plaintiff reported he "was planning on opening a small business. He had some money set aside from the settlement and it sounds like he is having some domestic problems and that money is all gone." (Tr. 232).   On November 25, 2008 the record indicates Plaintiff was "currently trying to find a job." (Tr. 232). On May 18, 2010, Dr. Williams wrote that Plaintiff "works in the iron works…[h]e is not working but he is involved in litigation." (Tr. 307). Thus, with the exception of the June 15, 2007 notation, none of these records support an inference that Plaintiff was working or able to work. Plaintiff's desire to return to work does not indicate that he could actually return to work. *Fargnoli v.*

*Massanari*, 247 F.3d 34, 40 (3d Cir. 2001)([A Plaintiff's] expressed desire to return to work at a light duty job cannot support a finding that he is actually capable of such work when he later testified that he cannot perform light work and his testimony is consistent with restrictions imposed by his treating physician) (citing *Talbot v. Heckler,* 814 F.2d 1456, 1461 (10th Cir. 1987) (claimant's application for vocational training did not create inference that "claimant thought he could work at a full range of light activity" as opposed to a "limited range of light or sedentary activity").

The ALJ was not entitled to rely on Plaintiff's alleged substance abuse, conservative treatment, or lack of objective evidence because she mischaracterized factual evidence and omitted contradictory findings in each of these areas. She mischaracterizes most of the evidence regarding Plaintiff's alleged work after 2001. She does not provide any other reason to reject Plaintiff's credibility.[10] Given these errors, the Court cannot engage in meaningful review of the ALJ's credibility assessment. Although the ALJ will not be required to find Plaintiff credible on remand, she will be required to make accurate factual characterizations and refrain from omitting significant contradictory evidence. The Court

---

[10] The ALJ wrote that, because Plaintiff told his doctor that he would "like to go on SSI," he must view SSI as an "elective" program. (Tr. 329). However, it is natural for claimants to discuss the social security disability process with their physicians. Merely noting that he would like to receive disability does not mean that he is not disabled or views SSI as elective.

recommends that the matter be remanded to the ALJ to properly evaluate Plaintiff's credibility.

### C.      The ALJ's assignment of weight to the medical opinions

Plaintiff asserts that the ALJ erred in assigning greater weight to the opinion of Dr. Grycrko, a non-examining source, than Dr. Kraynak, an examining source. The regulations state that "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527. However, an ALJ may give more weight to the opinion of a source that did not examine a claimant pursuant to the other statutory factors. 20 C.F.R. §404.1527(c). Section 404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Section 404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

Here, the ALJ gave less weight to Dr. Kraynak than Dr. Grycrko because "the totality of the evidence simply does not support limitations to this extent. To the contrary, the claimant drives and he has been able to continue working at some level. He is active with his daughter and was planning to start a trucking business."

However, as discussed above, there is no evidence after June 15, 2007 that Plaintiff was working at any level and his desire to start a business does not negate

his disability or Dr. Kraynak's opinion. The ALJ omitted significant evidence, so the ALJ was not entitled to rely on a generic claim that the "totality of the evidence" failed to support Dr. Kraynak's limitations. In particular, the ALJ never mentioned the significant objective findings Dr. Kraynak observed during his evaluation.   This precludes the Court from engaging in meaningful review regarding whether the "totality of evidence" supports Dr. Kraynak's opinion.

Plaintiff's ability to drive and be "active with his" nineteen year-old daughter do not contradict Dr. Kraynak's opinion. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity… It is well established that sporadic or transitory activity does not disprove disability." *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981). Plaintiff repeatedly indicated that he could drive no more than three hours, which is consistent with Dr. Kraynak's opinion that he can sit for no more than three hours. Moreover, the only reference in the record to Plaintiff being "active" with his daughter is when he was working with her on lacrosse moves. This was several years before the relevant period. In contrast, as Dr. Grycrko observed, Plaintiff described his present activities as very limited.

Defendant also cites to references to a trip to Las Vegas in Plaintiff's medical record. First, the ALJ did not cite this anywhere in her decision. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305

(3d Cir. 2013) (Review of an administrative decision may not be based on "post-hoc rationalizations made after the disputed action"). Second, this trip was before the relevant period. Third, this trip indicates only sporadic and transitory activity. *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity) (citing *Jesurum,* 48 F.3d at 119 (claimant's trip to Rhode Island two years prior to hearing was a "sporadic and transitory activity that cannot be used to show an ability to engage in substantial gainful activity")).

The ALJ does not point to any evidence that contradicts Dr. Kraynak's opinion that Plaintiff can sit for no more than three hours at a time. As discussed above, the ALJ omitted significant objective evidence that supports this opinion. The ALJ improperly relied on faulty inferences regarding Plaintiff's return to work and sporadic and transitory activities to reject Dr. Kraynak's opinion. Thus, the ALJ failed to develop the record with regard to the statutory factors for weighing opinion evidence. Given that an examining physician will generally be given more weight than a non-examining physician, the ALJ's failure to demonstrate that any other statutory factor undermines Dr. Kraynak's opinion means that the ALJ's assignment of weight lacks substantial evidence. On remand, the ALJ will not be

required to assign greater weight to Dr. Kraynak's opinion, but will have to provide sufficient justification pursuant to the statutory factors to assign him less weight than a non-examining source. The Court recommends that the case be remanded for the ALJ to appropriately analyze the weight to be given to Dr. Kraynak's opinion.

## VII.    Conclusion

Accordingly, the undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence, particularly Plaintiff's credibility and Dr. Kraynak's opinion.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections

which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: December 19, 2014              _____s/Gerald B. Cohn_____
                                             GERALD B. COHN
                                     UNITED STATES MAGISTRATE JUDGE